UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6051-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

BERT HARRIS,

    Defendant.

_____/

## DEFENDANT HARRIS' MOTION FOR DOWNWARD DEPARTURE

The Defendant, Bert Harris, through counsel files this Motion for Downward Departure pursuant to Title 18, U.S.C. § 3553(b), U.S.S.G., §§ 5K2.0 and 5K2.13, Diminished Capacity, and as grounds therefore states:

Chapter 5K2.0 Grounds for Departure (Policy Statement):

Under 18, U.S.C. § 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Circumstances that may warrant departure from the guideline range pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The



decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis.

Whether to depart from the sentencing Guidelines is a decision which requires a district court to make both factual and legal findings. Thus, to depart from the sentencing Guidelines, a district court must make two fundamental determinations: (1) what, if any, factor makes the case "atypical"; and (2) should that factor result in a different sentence. United States v. Hoffer, 129 F.3d 1196, 1200 (11th Cir. 1997). "The first of these determinations is factual in nature, see Koon v. United States, 116 S.Ct. 2035 (1996), while the second involves both legal and factual considerations, see Id. at 2047." Hoffer, 129 F.3d 1196, 1200..

Cases indicating a factor not adequately taken into consideration by the Sentencing Commission are said to fall outside the "heartland" of typical cases embodying the conduct described in the applicable guideline. Id. (citing U.S.S.G. ch.1, pt. A, intro. comment 4(b)). A district court determines whether a case falls outside the "heartland" by making a refined assessment of the facts of the case, and comparing those facts to the facts of other cases falling within the guideline's heartland. Id. (citing Koon, 116 S.Ct. at 2046-2047).

To determine whether a factor which takes a case outside the heartland should result in a different sentence, a district court must first decide whether the factor is forbidden, encouraged, discouraged, or unaddressed by the Guidelines as a potential basis for departure. Id. (citing Koon, 116 S.Ct. at 2046-2047). If a factor is forbidden, see, e.g., U.S.S.G. § 5H1.10 (race, sex, national origin, creed, religion and socio-economic status), a district court cannot use it to depart from the applicable guideline; to do so would be a per se abuse of discretion. Id. (citing Koon, 116 S.Ct. at 2045, 2047).

2

Finally, a district court may depart on the basis of a factor not addressed by the Sentencing Commission if it finds, "after considering the structure and theory of both the relevant individual Guidelines and the Guidelines taken as a whole," that the factor takes the case out of the applicable guideline's heartland. Koon, 116 S.Ct. at 2045 (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir.1993)). A sentencing court therefore properly departs even if the circumstances presented by the case vary only in degree from that embodied by the guideline. United States v. Ponder, 963 F.2d 1506,1509 (11th.Cir.1992); United States v. Williams, 948 F.2d 706, 709; (11th Cir. 1991) see also U.S.S.G. Ch.1, Pt. A4 (b).

Defendant Harris is requesting a downward departure pursuant to U.S.S.G. § 5K2.13 relating to diminished or reduced capacity. If the circumstances of a case fall squarely within the policy statement set forth in that section, this would be an encouraged factor, and the court is authorized to depart from the Guidelines on that basis, so long as a factor in not already considered in the Guidelines.

The Defendant entered a plea of guilty to violating Title 18 U.S.C. § 2252(a)(4)(B). He pled guilty to possession of child pornography. Defendant Harris ordered the video tape over the Internet from a web cite created by the United States Postal Service. The video tape was delivered to his home by United States Postal Inspectors. Shortly after the delivery of the video tape he was confronted outside of his home by the Inspectors. Immediately upon identifying themselves, Defendant Harris cooperated with law enforcement. He was told that a search warrant was going to be obtained so that the agents could enter his home. Instead of making the agents obtain the search warrant, he gave them permission to enter his home and conduct the search. The video tape was discovered in the home. The Defendant never viewed the video tape prior to the search.

3

Subsequently the tape was viewed after the appointment of undersigned counsel. Since the Defendant's arrest he has been on bond residing with his wife in Elgin, Illinois. He has reported as directed to the Pretrial Services Office without incident. Further reliance in support of the Defendant's Motion for Downward Departure is placed upon the psychological report prepared by Joel R. Kaplan, Licensed Clinical Psychologist located in Schaumburg, Illinois, near the Defendant's home.

Dr. Kaplan states in the Summary and Conclusions of his report that Defendant Harris was about five years old when his parents got divorced and that he has no memory whatsoever of his father. According to Harris, he hated his father when he was a child but now has no feelings towards him. Although Harris has worked steadily throughout his entire adult life, he considers himself to be a recovering alcoholic. According to the client, he began drinking heavily at the age of 25 or 26 and continued to drink heavily until January of 2000. In a typical day, he would drink a quart of whiskey. He made a New Year's resolution to stop drinking and with a few minor exceptions, has adhered to this resolution.

Further in the Summary and Conclusions of Dr. Kaplan, he states that "it has been at least two years since he has been able to get and maintain an erection long enough to have sexual intercourse." Mr. Harris became emotional during the evaluation only when we discussed his impotence. He stated that this impotence make him feel that he "is not a human being" and less than a whole person. His ability to perform sexually appears to be an integral part of his self concepts. When he is unable to perform sexually, his self-esteem plummets, and he develops deep feelings of inadequacy and worthlessness. He stated that prior to the videotape incident, he was angry with

himself, severely depressed, and extremely anxious because of his impotence and that he still feels that way whenever he thinks about this.

Dr. Kaplan goes on to state that (Harris) "has very limited insight into himself and his problems. For the most part, he has dealt with the problems in his life by utilizing the relatively primitive defense mechanisms of denial and repression. He appears, for example, to have greatly minimized the severity of his drinking problem. In the case of his impotence, however, his self-esteem was so tied into his ability to perform sexually, that his psychological defenses were overwhelmed. His impotence resulted in an adjustment disorder characterized by a great deal of emotional distress, strong feelings of inadequacy and worthlessness, and a disturbance in conduct. When viewed in this light, Mr. Harris' assertion that the purchase of the videotape was an experiment and an act of desperation seems quite plausible."

The report prepared by Dr. Kaplan is attached in it entirety for review for all the parties concerned. (Defendant's Exhibit A).

In addition to the "Kaplan Report," Defendant Harris has provided additional written support highlighting his personal problems. This extremely personal statement is in addition to his statement for acceptance of responsibility which was submitted earlier. (Defendant's Exhibit B).

Harris states that "prior to ordering the tape, I have been unable to get and maintain an erection to complete intercourse. This has been a problem since at least 1997. Neither of the two doctors I had in Florida would prescribe Viagra to me. One said I did not need it. The other ran test after test but never came to a conclusion. When I ordered the tape it was my hope that maybe something different or naughty would spark something in my brain to get me going again." The Defendant's letter dated August 1, 2000 is attached for the Court's consideration.

**MEMORANDUM OF LAW**

In the matter of United States v. Russell, 917 F.2d 512,517 (11th Cir.1990), the court stated that U.S.S.G. § 5K2.13 provides as follows: If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

A crime of violence is defined in U.S.S.G. § 4B1.2. The term "crime of violence" means any offense under federal or state law punishable by imprisonment for a term exceeding one year that–

(i)   has an element the use, attempted use, or threatened use of physical force against the person of another, or

(ii)  is a burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another. Possession of child pornography has not been defined as a violent crime. See United States. v. Bonner, 85 F.3d 522, 527 (11th.Cir.1996) (departure based on diminished mental capacity was not available for someone convicted of a crime of violence).

Defendant Harris' use of alcohol initially appears to be problematical when confronted with the provisions of U.S.S.G. § 5K2.13. The Defendant's psychological condition may have been exacerbated by the use of alcohol. It is impossible to determine whether the psychological issue caused the excessive amount of alcoholic consumption or vice versa. Taking once again from Dr. Kaplan's Summary and Conclusions he states, "In the case of his impotence, however, his self-

6

esteem was so tied into his ability to perform sexually, that his psychological defenses were overwhelmed. His impotence resulted in an adjustment disorder characterized by a great deal of emotional distress, strong feelings of inadequacy and worthlessness, and a disturbance of conduct."
It appears that the Defendant has curtailed the use of alcohol since January, 2000.

In the case of United States v. Miller, 146 F.3d 1281 (11th Cir.1998) the appropriateness of a downward departure based upon a reduced mental capacity under U.S.S.G. § 5K2.13 was examined. The court stated that "even though the facts of the crime, the possession of child pornography, may not be so unusual as to take the case out of the "heartland", a departure may be justified "if the Defendant had a characteristic which took him out of the heartland of cases." Id. at 1285. The court further stated that "§ 5K2.13 requires that the diminished capacity be linked to the commission of the offense."

WHEREFORE, the Defendant, respectfully requests that the Court grant this Motion for Downward Departure and sentence him in accordance with the provisions of 18 U.S.C. § 3553 (a) and (b).

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____
Robert N. Berube
Supervisory Assistant
Federal Public Defender
Florida Bar No. 304247
Attorney for Defendant
101 N.E. 3rd Avenue, Suite 202
Fort Lauderdale, Florida 33301
(954) 356-7436 / (Fax) 356-7556

7

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the aforementioned motion was mailed on this 7th day of August, 2000, to Kathleen Rice, Assistant United States Attorney, at 299 East Broward Boulevard, Fort Lauderdale, Florida 33301.

Robert N. Berube

**B**AUM
&
**A**SSOCIATES

830 EAST HIGGINS ROAD, SUITE 112      COUNSELING AND              (847) 619-BAUM
SCHAUMBURG, IL 60173                  PSYCHOTHERAPY CENTERS       FAX (847) 619-0866

## Psychological Evaluation

**Client: Bert Harris    Age: 59**
**Dates seen: 6/20/00, 6/29/00, 7/6/00, 7/13/00, 7/20/00**
**Date of Report: 7/27/00**

### Presenting Problem

Mr. Harris stated that while using a computer to surf the web in November 1999, he found a "sex website" and ordered a videotape that contained child pornography. He later discovered that this was a government controlled website run by the U.S. Post Office. According to the client, the videotape was delivered to his house on December 15, 1999. His house was searched and the videotape was found on the same day. He stated that the videotape depicted sexual activity involving an adult male, an adult female, and a young girl, approximately 12 years of age. According to the client, the whole videotape was approximately three or four minutes in length. He was arrested in March 2000. He was living in South Elgin, Illinois at the time, having moved there from Hollywood, Florida in January 2000. A federal public defender was appointed to defend him, and he was arraigned in Florida in April 2000. He stated that he pled guilty to possession of a videotape that contained child pornography on May 29, 2000. The sentencing hearing has been scheduled for August 11, 2000 in Fort Lauderdale, Florida. He stated that he may be sentenced to probation, home confinement or a year or more in prison. Mr. Harris expressed the opinion that a psychologist report might be helpful to him during the sentencing hearing.

### Behavioral Observations

Mr. Harris was casually dressed during the evaluation sessions, and his appearance was unremarkable. He was generously cooperative but rather guarded at times. His affect was generally rather bland, but he became emotional and even tearful when emotionally sensitive issues were touched upon. He was always coherent and expressed himself reasonably well. There were no indications of a thought disorder or of highly unusual ideation.

DEFENDANT'S
EXHIBIT
A



**BAUM & ASSOCIATES**

830 EAST HIGGINS ROAD, SUITE 112
SCHAUMBURG, IL 60173

COUNSELING AND
PSYCHOTHERAPY CENTERS

(847) 619-BAUM
FAX (847) 619-0866

### History and Emotional State

Mr. Harris stated that prior to the previously described incident, he had never been arrested or convicted of any offense other than minor traffic violations.

Mr. Harris stated that his mother, aged 85, is still living. According to the client, he does not know his father's whereabouts or even whether he is still living. He stated that he was about five years old when his parents got divorced and that he has no memory whatsoever of his father. He stated that he "hated" his father when he was a child but that he now has no feelings towards him. He stated that he was raised by his mother, who never remarried, and that he has always had a good relationship with her. According to the client, he has a sister who is one year older and a brother who is four years younger. He stated that he has a good relationship with his sister who lives in the area, but that he seldom sees his brother, who lives in Mount Vernon, in central Illinois.

Mr. Harris stated that he has never has any psychotherapy or personal counseling of any kind.

According to the client, he was a below average to average student in high school. He graduated from a public high school in Elgin at the age of 18 and has no other education.

Mr. Harris stated that he was a P.F.C. in the U.S. Marine Corps from the age of 18 to the age of 22, when he received an honorable discharge. After returning to civilian life, he held a variety of jobs. He stated that he "built computers" for two years and that he was a quality control supervisor for Motorola for three years. he was a television repairman for RCA for three years an a telephone repairman for the same company for 22 years. He moved to Memphis, Tennesee in 1991 to work for Mid-America Communications and installed telephone systems for that company for four years. He moved to Hollywood, Florida in 1995 to work for Pavarini Communications and installed telephone systems and repaired computers for that company for four years. He was fired from that job in December 1999 because of "private use of company equipment". He used one of the company's computers to order the porographic videotape. He has been repairing pagers for the past four months, but will lose this job in August when the company he works for relocates.

# BAUM & ASSOCIATES

830 EAST HIGGINS ROAD, SUITE 112
SCHAUMBURG, IL 60173

COUNSELING AND
PSYCHOTHERAPY CENTERS

(847) 619-BAUM
FAX (847) 619-0866

Mr. Harris reported that he got married for the first time at the age of 24. His first wife (Camille) was 19 at the time. Camille was, for the most part, a housewife, but worked as a receptionist in a hospital during the last two years of their marriage. This marriage ended in divorce after 16 years. The client stated that Camille was pressuring him to get a job that paid more money. He didn't want to change jobs, and there was considerable conflict over this issue, which led him to file for divorce. There was one daughter, age 34, and two sons, age 32 and 29, from this marriage. His daughter is a sixth grade teacher. His older son is some kind of a manager, and his younger son is an electronics technician. He stated that all three of his children are college graduates.

Mr. Harris was age 57 when he got married for the second time. This is also the second marriage for his current wife (Marjorie), age 52, who has three children from her first marriage. There are no children from the current marriage. He stated that he has known Marjorie for over 20 years. Marjorie is a teacher's aide and works with children with behavioral and/or emotional problems. The client stated that the recent incident with the videotape has been a "disaster" with respect to his relationship with Marjorie. He stated that "the whole thing is a very big deal for Marjorie." Prior to this incident his relationship with her was "okay". He was living in Florida, where he had a well paying job, and she was living in Illinois because she wanted to work two more years to obtain a pension. Prior to the incident with the videotape, he feels that there were no major problems in his relationship with Marjorie. He stated that at the present time, he and Marjorie are "just to people are occupying the same building".

Mr. Harris considers himself to be a recovering alcoholic. He feels that he has an unusually high tolerance for alcohol. According to the client, he began drinking alcohol at the age of 16 or 17 and started to drink heavily at the age of 25 or 26. He stated that he continued to drink heavily until January of this year. He made a New Year's resolution to stop drinking, and with a few minor exceptions, has adheared to this resolution. He stated that in the past he had been able to stop drinking for a week or two. He stated that he had never been hospitalized for alcoholism and that he has never attended any AA meetings or gone through any rehabilitation programs. He stated that he has never had any alcohol related physical problems and that he has never lost a job because of his alcoholism. He asserted, however, that his drinking is an expensive habit and that his alcoholism has hurt him financially (but in no other way). He preferred hard liquor, but sometimes drank beer during the day and hard liquor at night. He generally drank whiskey (Canadian Club) in a typical

**BAUM & ASSOCIATES**

830 EAST HIGGINS ROAD, SUITE 112　　COUNSELING AND　　(847) 619-BAUM
SCHAUMBURG, IL 60173　　PSYCHOTHERAPY CENTERS　　FAX (847) 619-0866

day, he would drink a quart of whiskey. He stated that he never consumed alcohol at work but that he used to drink heavily at night.

Mr. Harris stated that it has been at least two years since he has been able to get and maintain an erection long enough to have sexual intercourse. He stated that his total sexual impotence for such a long period of time has resulted in considerable emotional distress. He stated that his impotence makes him feel that he is "not a total human being" and "less than a whole person." He stated that prior to the videotape incident, he was angry with himself, severely depressed and extremely anxious because of his impotence and that he still feels anxious, depressed, and angry with himself whenever he thinks about his impotence. He stated that he doesn't know the cause of his impotence but that it may be due to age. According to the client, his impotence was "a gradual thing". He stated that his doctor is reluctant to prescribe viagra because of his high blood pressure.

Mr. Harris stated that he has never had sexual relations with children and that he has no interest in child pornography or sexual relations with children. He stated that, at the present time, is still extremely concerned about this and he has a high anxiety level, frequently becomes depressed and is frequently angry with himself. According to the client, the videotape was an "experiment". He wanted to see if viewing the videotape would cause him to get an erection. Thus, buying the videotape was an attempt to overcome his impotence by trying something "new and different" because "nothing else seemed to work." He feels that buying the videotape was an impulsive act that reflected poor judgement as well as "an act of desperation."

<u>Summary and Conclusions</u>

During the evaluation, Mr. Harris was generally cooperative but rather guarded at times. His affect was generally rather bland but he became emotional and even tearful when emotionally sensitive issues were touched upon.

A number of things stand out in the history. He stated that he was about five years old when his parents got divorced and that he has no memory whatsoever of his father. According to the client he "hated" his father when he was a child but now has no feelings towards him.
Although, he has worked steadily throughout his entire adult life, he considers himself to be a recovering alcoholic. According to the client, he began drinking heavily at the age of 25 or 26 and continued to drink heavily until

**B**AUM
&
**A**SSOCIATES

830 EAST HIGGINS ROAD, SUITE 112
SCHAUMBURG, IL 60173

COUNSELING AND
PSYCHOTHERAPY CENTERS

(847) 619-BAUM
FAX (847) 619-0866

January of 2000. In a typical day, he would drink a quart of whiskey. He made a New Year's resolution to stop drinking and with a few minor exceptions, has adhered to this resolution. He stated that in the past, he had been able to stop drinking for only a week or two.

According to the client, it has been at least two years since he has been able to get and maintain an erection long enough to have sexual intercourse. Mr. Harris became emotional during the evaluation only when we discussed his impotence. He stated that his impotence makes him feel that he "is not a human being" and "less than a whole person". His ability to perform sexually appears to be an integral part of his self concepts. When he is unable to perform sexually, his self-esteem plummets, and he develops deep feelings of inadequacy and worthlessness. He stated that prior to the videotape incident, he was angry with himself, severely depressed, and extremely anxious because of his impotence and that he still feels that way whenever he thinks about this. At the present time, he displays considerable emotional distress, mainly due to situational factors.

Mr. Harris stated that, in his mind, the videotape was an "experiment." He wanted to see if viewing the videotape would cause him to get an erection. Thus, buying the videotape was an attempt to overcome his impotence by trying something "new and different" because "nothing else seemed to work." He asserted that buying the videotape was "an act of desperation" and an impulsive act that reflected poor judgement.

Mr. Harris appears to have very limited insight into himself and his problems. For the most part, he has dealt with the problems in his life by utilizing the relatively primitive defense mechanisms of denial and repression. He appears, for example, to have greatly minimized the severity of his drinking problem. In the case of his impotence, however, his self-esteem was so tied into his ability to perform sexually, that his psychological defenses were overwhelmed. His impotence resulted in an adjustment disorder characterized by a great deal o emotional distress, strong feelings of inadequacy and worthlessness, and a disturbance of conduct. When viewed in this light, Mr. Harris' assertion that the purchase of the videotape was an experiment and an act of desperation seems quite plausible.

**BAUM & ASSOCIATES**

830 EAST HIGGINS ROAD, SUITE 112
SCHAUMBURG, IL 60173

COUNSELING AND
PSYCHOTHERAPY CENTERS

(847) 619-BAUM
FAX (847) 619-0866

The DSM-IV diagnoses are:
309.4 Adjustment Disorder, Chronic, with Mixed Disturbance of Emotions and Conduct
302.72 Male Erectile Disorder
303.90 Alcohol Dependence, Early Full Remission

*[signature]*

Joel R. Kaplan, PhD
Licensed Clinical Psychologist

1 AUG 00

Prior to ordering the tape, I have been unable to get and maintain an erection to complete intercourse. This has been a problem since at least 1997. Neither of the two doctors I had in Florida would prescribe Viagra to me. One said I did not need it. The other ran test after test but never came to a conclusion.

When I ordered the tape it was my hope that maybe something different or naughty would spark something in my brain to get me going again.

Since that time I have relocated to Illinois and am living with my wife, Marlie. It has been with her help and love that I am no longer obsessed with the problem. Although I still can not maintain to completion I am not at my wits end about it. It is possible that the doctor I am seeing now, maybe able to prescribe something for me, after receiving copies of the tests my other doctor ordered in Florida, those copies have been requested.

I know what I did was dumb and stupid. It has ruined my life. I am very sorry about it.

DEFENDANT'S
EXHIBIT
B